## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **MOBILE EQUITY CORP.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 2:21-cv-126** |
| | § | |
| **WALMART INC.,** | § | |
| | § | **JURY TRIAL** |
| *Defendant* | § | |
| | § | |

## ORIGINAL COMPLAINT

Plaintiff Mobile Equity Corp. ("MEC") files this Original Complaint against Defendants Walmart Inc. ("Walmart" or "Defendant"), alleging as follows:

## I.   INTRODUCTION

1.      MEC invented a novel and cost-effective technical structure for conducting mobile-payment transactions, making them more secure, convenient, and efficient.  It filed a provisional patent for this ground-breaking invention in 2009—years before Apple Pay, Samsung Pay, and Walmart Pay were released.[1]

2.      MEC sought patent protection on its intellectual property, raised venture capital to build its business and platform, developed a working mobile-payments platform it demoed, and obtained its first patent in November 2013. MEC approached the industry to revolutionize its systems with its patented technology, but, after years of hard work, MEC's innovations were simply taken without its permission.

---

[1] Apple Pay was released in October 2014.  Samsung Pay was released in August 2015.  Walmart Pay was released in December 2015.

3.      In 2015, Walmart was considering multiple mobile-payment solutions.  Walmart was demoing a mobile-payments solution created by the Merchant Customer Exchange ("MCX"), a large consortium of major U.S. retailers (*e.g.*, Walmart, Target, 7 Eleven, and CVS), which it had helped found years before.  By the summer of 2015, MCX had been delayed multiple times, had proven difficult to implement, and looked unlikely to succeed.[2]

4.      By, at least the fall of 2015, Walmart had changed course from MCX.  Instead, it chose to incorporate MEC's patented technology into a new solution it called Walmart Pay.  Walmart first launched Walmart Pay in December 2015 (over two years after MEC's first patent issued).

5.      Walmart Pay is a Walmart service that provides a mobile-payment technology that allows a Walmart customer, using a Walmart-provided app, to "use your phone to pay quickly, easily, & touch-free at checkout."[3]   Walmart Pay incorporates MEC's patented technology, without MEC's permission.  It infringes MEC's Patents.

6.      MEC's technology has been successful for Walmart.  Walmart has repeatedly praised the solution Walmart Pay represents.  Walmart Pay processes billions of dollars annually for Walmart.  But Walmart has not compensated MEC for the use of MEC's invention.

7.      MEC's business has suffered because of Walmart's infringement.  This action is to remedy that infringement and to require Walmart to respect MEC's patent rights.

---

[2] *See, e.g.*, https://digital.hbs.edu/platform-rctom/submission/mcx-and-currentc-how-to-become-the-laughingstock-of-the-mobile-payments-industry/ .

[3] *See, e.g.*, https://www.walmart.com/cp/walmart-pay/3205993. Walmart Pay is discussed in detail later in this Complaint.  Walmart Pay, as accused of infringement in this case, includes the uses of Walmart Pay in connection with any form of payment that uses the Walmart Pay process, including but not limited to "Scan & Go" and any other uses of Walmart Pay.

## II.     NATURE OF THE SUIT

8.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

## III.    THE PARTIES

9.      Plaintiff **Mobile Equity Corp.** is a Delaware corporation with a principal place of business in the Plano, Texas area within this District.

10.     Defendant **Walmart Inc.** is a Delaware corporation with a principal place of business at 702 S.W. 8th Street #555, Bentonville, Arkansas 72716.  Walmart Inc. may be served through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## IV.    JURISDICTION AND VENUE

11.     As an action under the patent laws of the United States, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     This Court has personal jurisdiction over Defendant Walmart.

13.     Walmart has committed, and continues to commit, acts of infringement in this District, has conducted business in this District, and/or has engaged in continuous and systematic activities in this District.

14.     This Court has personal jurisdiction over Walmart in this action because Walmart has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Walmart would not offend traditional notions of fair play and substantial justice. Walmart has committed and continues to commit acts of infringement in this District by, among other things, using, offering to sell, and selling products and/or services that infringe the Asserted Patents, including Walmart Pay.

15.     This Court has specific personal jurisdiction over Walmart in this action pursuant to due process and the Texas Long-Arm Statute because the claims asserted herein arise out of or are related to Walmart's voluntary contacts with this forum, such voluntary contacts including but not limited to: (i) at least a portion of the actions complained of herein; (ii) purposefully and voluntarily placing Walmart Pay into this District and into the stream of commerce with the intention and expectation that it will be acquired by customers and used in this District; or (iii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services, including Walmart Pay, provided to customers in Texas and in this District.

16.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(3) and 1400(b) for at least the reasons set forth above.  Walmart is registered to do business in Texas, and Walmart has transacted business in this District. Walmart has regular and established places of business in this District.  Walmart has committed acts of direct and indirect infringement in this District.

17.     Walmart offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas and in this District.  As non-limiting examples, Walmart distributes products directly to customers and through its partners, including through Apple's App Store and Google's Google Play.  Among its other businesses, Walmart is in the business of providing mobile-payment services in this District.

### A.     Walmart Has an Extensive Presence in Texas and in This District

18.     Walmart operates over 500 Walmart stores in Texas. Walmart operates more stores in Texas than it does in any other state, approximately 50% more stores than its next largest state (Florida).[4]  The following 2020 image shows the distribution of Walmart stores by state:

---

[4]  *See, e.g.,* Walmart Inc. 2021 10-K Annual Report, at 26. (available at https://stock.walmart.com/investors/financial-information/sec-filings/default.aspx).



19.     Walmart's stores include multiple stores within this District, including locations in, at least, the following cities in this District: Anna; Athens; Atlanta; Beaumont; Bonham; Bridge City; Carthage; Center; Crockett; Cross Roads; Denison; Denton; Flower Mound; Frisco; Gainesville; Gilmer; Gun Barrel; Henderson; Hickory Creek; Highland Village; Jacksonville; Jasper; Kilgore; Liberty; Lewisville; Livingston; Longview; Lufkin; Lumberton; Marshall; McKinney; Mineola; Mt. Pleasant; Nacogdoches; New Boston; Palestine; Plano; Port Arthur; Princeton; Prosper; Roanoke; Sherman; Silsbee; Sulphur Springs; Texarkana; Tyler; West Orange; Woodville; and Vidor.  A Walmart store has been present in Marshall since, at least, 1986.

20.     Walmart operates, at least, nineteen distribution centers in Texas.  Those include distribution centers within this District, including locations in, at least, the following cities in this District: Fort Worth (in Denton County); Palestine; Sanger; and Terrell.

21.     Walmart operates a number of corporate offices in Texas.  Those include, at least, technology development centers, including one in this District in Plano, Texas.

22.     Walmart employs over 150,000 people in Texas, has collected $1.8 billion in taxes in Texas, and has paid over $500 million in taxes and fees in its fiscal year ending in 2020.[5]

---

[5] *See, e.g.*, https://corporate.walmart.com/our-story/locations/united-states/texas#.

**B.     Walmart Pay was Tested and Used in Texas and in This District**

23.     Walmart Pay was tested in select Walmart stores starting in December 2015.[6] Walmart Pay was tested in Texas and Arkansas stores before it was made available nationwide.[7]

24.     Walmart Pay has been available nationwide since at least July 2016.[8]

25.     Walmart Pay has been used in this District for many years.  Walmart Pay has been put into service in this District, including by Walmart and its customers.  Walmart has distributed the Walmart Pay application is this District, including distributing the Walmart Pay application through third-parties such as Apple and Google.

26.     Walmart Pay is used in this District to, at least, receive an identifier to initiate a transaction that identifies a Walmart terminal (*e.g.*, a point-of-sale terminal, a self-checkout terminal), such as an identifier exemplified in the Quick Response ("QR") code displayed on Walmart terminals in this District.  Walmart Pay is used in this District to, at least, send a request for transaction information to a Walmart terminal in this District associated with the identifier. Walmart Pay is used in this District to, at least, receive transaction information from the Walmart terminal, including the amount of the transaction.  Walmart Pay is used in this District to, at least, identify a purchase accounts and initiate a transaction.

27.     Walmart derives financial benefits through its business in Texas and in this District.

28.     On information and belief, Walmart Pay has been used in more Texas Walmart stores than those of any other individual state.  On information and belief, more Walmart Pay transactions have occurred in Texas than in any other state.

---

[6] *See, e.g.*, https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay
[7] *See, e.g.*, https://www.paymentssource.com/news/walmart-pay-launches-in-texas-arkansas; https://www.businesswire.com/news/home/20160516005840/en/Walmart-Introduces-Walmart-Pay-in-Texas.
[8] *See, e.g.*, https://corporate.walmart.com/newsroom/2016/07/06/walmart-pay-now-available-in-all-walmart-stores-nationwide.

## V.     BACKGROUND

### A.     MEC and the Patented Technology

#### 1.     The Financial Services Industry is an Active Area of Innovation

29.     The financial-services industry is one of active change and innovation.

30.     Finance and technological development have been linked throughout history. For example, writing in early civilization may have developed to record payments and debts. The term "fintech" has been coined to refer to the large number of technology companies that seek to revolutionize the financial industry.

31.     The last 75 years have seen a great number of financial-services innovations that have fundamentally changed our day-to-day lives, such as, credit cards; automatic teller machines (ATM); online banking; automatic bill payment; mobile wallets; automated clearing house transfers (ACH); electronic benefit transfer cards (EBT); and cryptocurrencies.

32.     Innovations in the financial technology are patented by institutions from banks (*e.g.*, Bank of America, JPMorgan Chase) to traditional technology companies (*e.g.*, IBM, Apple, Google, Microsoft).  These companies often tout the number of patents that they hold.

33.     Walmart, for example, has many patents related to financial technology, including mobile device payment.[9]

34.     Mobile payment is and has been an active area of invention.  Many different approaches to mobile payments exist.

---

[9] These are four examples of Walmart's mobile-device payment: U.S. Patent Nos. 10,803,435 ("Method for self-checkout with a mobile device"); 10,679,219 ("Method and apparatus for automated shopper checkout using radio frequency identification technology"); 10,269,003 ("System and method for transaction payments using a mobile device"); and 9,514,455 ("Mobile device payment").

35.     Promoting financial-services innovation has been a theme of, at least, the three most recent presidential administrations.[10]

## 2.     The Asserted Patents

36.     This cause of action asserts infringement of United States Patent Nos. 8,589,236 (the "'236 Patent") and 10,535,058 (the "'058 Patent") (collectively, the "Asserted Patents" or the "MEC Patents").

37.     The U.S. Patent & Trademark Office ("Patent Office") rigorously scrutinizes applications for FinTech-related inventions, such as the inventions in MEC's Patents.   That includes a strict examination to determine if the patent applications claim patent-eligible subject matter under 35 U.S.C. § 101.  Allowance rates for FinTech-related inventions are low.  The Patent Office's allowance of patents in the FinTech technology area thus reflects that the patents are valid and claim eligible subject matter.

38.     A true and correct copy of the '236 Patent, entitled "Mobile Payment Station System and Method," with Mr. Marwan Afana as the named inventor, is attached hereto as Exhibit 1.

39.     The '236 Patent duly and legally issued on November 19, 2013.

40.     MEC is the current owner by assignment of all rights, title, and interest in and under the '236 Patent.  MEC has standing to sue for infringement of the '236 Patent.

---

[10]   *See,    e.g.*,    https://obamawhitehouse.archives.gov/blog/2016/06/10/future-finance-now; https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf; https://hill.house.gov/news/documentsingle.aspx?DocumentID=8090    ("Biden   Administration Expected to Aid FinTech Innovation").

41.     A true and correct copy of the '058 Patent, entitled "Mobile Payment Station System and Method," with Mr. Marwan Afana as the named inventor, is attached hereto as Exhibit 2.

42.     The '058 Patent duly and legally issued on January 14, 2020.

43.     MEC is the current owner by assignment of all rights, title, and interest in and under the '058 Patent.  MEC has standing to sue for infringement of the '058 Patent.

### 3.     The Development of MEC's Patented Inventions

44.     The Asserted Patents result from the inventive work of Marwan Afana.  Mr. Afana devoted the last 11 years of his life pursuing his mobile-payment invention and building a business based around his technology.   Sadly and tragically, Mr. Afana unexpectedly passed away in November 2020.

45.     Mr. Afana immigrated to the Dallas area from Saudi Arabia in the 1980s to study electrical engineering.   He then spent over 20 years working with large telecommunications companies—such as AT&T, Ericsson, Lucent, and MCI—developing their projects (some on a global scale) for mobile networks, point-of-sale systems, mobile imaging, and billing systems.

46.     The intersection of his life's experience led Mr. Afana to see a novel solution for mobile payments.  Based on his belief in his invention, Mr. Afana left his secure and lucrative engineering career to build MEC.

47.     Mr. Afana's novel solution, reflected in the Asserted Patents, provides a revolutionary, elegant, and counter-intuitive payment system that improves the security and convenience of conventional merchant point-of-sale systems while reusing existing hardware.  The solution understands the function and problems of traditional point-of-sale systems and cleverly engineers a way to build a new system that incorporates elements of existing systems to make payment transactions more secure, efficient, and convenient.

48.     Mr. Afana worked for years to commercialize his creation.  He established a business in Texas and secured millions of dollars in investments.  He assembled a global team and built a working mobile-payments platform at MEC.  Mr. Afana traveled the country (and the world) to meet with potential partners.  MEC also secured global patent rights for Mr. Afana's invention.

i)     **Conventional Payment Systems**

49.     Conventional payment-card transactions (*e.g.*, "swiping" a credit card at the point of sale) are familiar to most adults.  These transactions bundle transaction information and the purchaser's information into a transmission from the payment terminal.  In the conventional approach, transactions are initiated and flow in a "forward" path from the payment terminal to an authorization server containing both the purchase and payment information.

50.     The conventional architecture is based on receiving the customer's account number at the point-of-sale terminal (*e.g.*, through a "swipe" or near-field communications, "NFC," transmission) and then having the terminal transmit that information to the banks through payment-clearing networks.  MEC's provisional patent application depicts this conventional architecture as follows:[11]



51.     These conventional architectures are technical systems that have technical problems, including security vulnerabilities. One category of security vulnerability they suffer

---

[11] U.S. Provisional App. No. 61/279,322, at 10.

from is exposing a customer's account information (*e.g.*, credit card information).   These vulnerabilities are the result of the structure of conventional systems.

52.   One security vulnerability is at the point-of-sale terminal itself. The conventional systems, as they existed in 2009, required the customer to provide account information at the terminal, either through swiping the physical card, tapping the card, or through an NFC-protocol transmission.

53.   This engineering design exposes the customer's information, risking its compromise, such as through a credit-card skimmer.

54.   Walmart customers have been victims of such skimming attacks.[12] The customers of many other retailers have also been the targets of such attacks.[13]

55.   This engineering design also exposes the customers' information because it is stored in the terminal.   This risks that the information may be compromised, such as through hacking into the point-of-sale terminal, such as with a malware attack, or the transmission between the terminal and the servers.[14]

56.   Walmart's point-of-sale systems have been targeted by hackers.[15] Other retailers have also been the targets of such attacks.

57.   These security problems are data-security problems that specifically arise as a result of the way the conventional merchant payment networks receive and process sensitive customer-account data.

---

[12] *See, e.g.*, https://krebsonsecurity.com/2016/05/skimmers-found-at-walmart-a-closer-look/ .

[13] *See, e.g.,* https://www.arklatexhomepage.com/news/crime/credit-card-skimmer-found-on-gas-pump-at-marshall-convenience-store/  (Marshall, TX); https://wjla.com/news/local/giant-food-credit-card-data-breach (Washington D.C.).

[14] *See, e.g.*, https://docs.broadcom.com/doc/attacks-on-point-of-sale-systems-en.

[15] *See, e.g.*, https://www.wired.com/2009/10/walmart-hack/ .

ii)    **MEC's Patented Improvements**

58.    The claims of the MEC Patents improve upon the technical structure of payment systems and offer a number of benefits, including compatibility with existing systems, such as by allowing for the reuse of existing point-of-sale hardware by changing its operation.  The claims allow a customer to execute a transaction without sharing confidential information (*e.g.*, a credit card number) with the point-of-sale terminal. The claims achieve this through a specific solution that, in part, engineers a counterintuitive change to the conventional communications flow, rearranging it from a "forward" flow to a "backward" flow.

59.    This approach, unlike the conventional approach, can begin with a mobile device transmitting a specific identifier to a server (different types are discussed).  For example, a mobile device can begin a transaction by scanning a QR code displayed on a payment terminal. The mobile device can then send a request to make the transaction, including the scanned identifier (*e.g.*, data that identifies a point-of-sale terminal) to a server.  The server then, for example, can query the point-of-sale terminal for the transaction information, such as an amount.  The server is able to identify the specific customer's account (*e.g.*, based on the customer sending a request to initiate the transaction), and then clears the transaction using available account information.

60.    The MEC Patents thus ensure that confidential information is not accessed by, routed through, or stored in the point-of-sale terminal.  The only data exposed at the point-of-sale terminal is, essentially, information that can be publicly known (*e.g.*, the identity of the terminal/merchant and the amount to be paid).  The customer's account information is not exposed at the terminal and is instead, for example, kept securely with the customer's account.  This technological change improves the security of sensitive customer data, such as credit card information.  This improvement has tangible benefits, such as by reducing fraud costs and improving customer privacy.

61.     The innovation of the MEC Patents provides, among other benefits, security and convenience benefits beyond conventional payment architectures, including NFC-based systems (such as Apple Pay).  In addition to the security benefits discussed above, the MEC Patents also provide additional benefits, some of which include:

a.  First, the solution is compatible with most point-of-sale systems (through changing their programming) and mobile-devices and does not require a merchant to purchase new devices or complex technologies (*e.g.*, NFC or chip-readers).  This reduces cost and complexity.

b.  Second, the solution is compatible with most mobile devices. It does not require a mobile device with a new technology such as an NFC element.  This increases the number of potential users and makes the technology more accessible.

c.  Third, the approach allows transactions to execute electronically (*e.g.*, without a physical "swipe").  This makes all payments "contactless," which has several benefits, including speeding up the transaction process, which further reduces costs (*e.g.*, those related to waiting for checkout).

d.  Fourth, unlike other mobile payment solutions, MEC's approach lets the merchant communicate the payment amount directly to the payment server.  This eliminates payment-amount error (or fraud) that can result from allowing a payor (*e.g.*, the customer) to manually entering the amount.

62.     In short, MEC created an elegant approach that simultaneously offers significant benefits and is, at the same time, compatible with and deployable on existing systems while improving the payment system infrastructure.

63.     This approach was novel.  And the patented MEC solution is not only different from the prior art, it is, essentially, the opposite of the prior art.

64.     Initiating a transaction, at the point-of-sale, by transmitting a request to a server is contrary to conventional systems known in the art.

65.     The Patent Office reaffirmed the unconventional nature of the MEC Patents' claims during their extensive prosecution, including during the six-plus-year examination of the '058 Patent.  In that proceeding, MEC explained how its inventions improved the security of and ease

of use of conventional mobile-payment systems. Conventional systems "expose[d] payment credentials to the merchant's terminal," which can be "vulnerable at the merchant terminal to security threats."[16]  The MEC Patents' claims, in contrast, "recit[e] a changed transaction process that modifies the messaging of these prior solutions.  This improves on the technical problems of NFC and user-entered transaction information by modifying how the messaging for a transaction is performed."[17]  The Patent Office allowed the claims, reaffirming that they claim patent-eligible subject matter.

### B.     Walmart's Infringement

66.     Walmart Pay uses Mr. Afana's invention without MEC's permission.  It infringes the MEC Patents.

67.     Walmart Pay is a mobile-payment solution that Walmart first introduced on December 10, 2015[18] and fully deployed—in over 4,600 stores—by July 6, 2016.[19]  This was after two years after MEC's first patent issued and after MEC demonstrated its technology to the industry.

68.     Walmart Pay allows Walmart customers to pay, at any Walmart register, using their mobile phone.  The customer initiates payment by scanning the QR code presented at the payment terminal:

---

[16] U.S. Patent App. No. 14/082,425, July 19, 2019 Response to Final Rejection, at 7–12.
[17] U.S. Patent App. No. 14/082,425, July 19, 2019 Response to Final Rejection, at 7–12.
[18] https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay.
[19]          https://corporate.walmart.com/newsroom/2016/07/06/walmart-pay-now-available-in-all-walmart-stores-nationwide.



69.     Generally, once the app is setup, all the user has to do is scan the QR code on a Walmart terminal to complete payment.[20]  The mobile device uses the QR code to "send[] a signal to Walmart's server that it's okay to use Walmart Pay for that particular purchase."[21]  The QR code "itself does not transmit any financial information."[22]  To make Walmart Pay possible, Walmart installed proprietary software upgrades to its point-of-sale systems.[23]

70.     When Walmart launched Walmart Pay it described it as "like no other mobile payments solution available today."[24]  Walmart's senior vice president explained that "[t]he simplicity and ease of Walmart Pay comes not only from how it works, but also in how it's been built: We made a strategic decision to design Walmart Pay to work with almost any smartphone and accept almost any payment type – even allowing for the integration of other mobile wallets in

---

[20]     https://corporate.walmart.com/newsroom/videos/b-roll-using-walmart-pay;  *see   also*  https://www.youtube.com/watch?v=8BQrNNEJDag  ("Walmart   Introduces   Walmart   Pay"); https://www.youtube.com/watch?v=5Vrns65-M78 ("How to Register to use Walmart Pay").
[21] https://www.walmart.com/cp/walmart-pay/3205993.
[22] https://www.walmart.com/cp/walmart-pay/3205993.
[23]     *See,   e.g.*,   https://www.cnbc.com/2015/12/09/wal-mart-launches-its-own-take-on-mobile-pay.html
[24] https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay; *see also* https://www.youtube.com/watch?v=x0RL1M244VM; https://corporate.walmart.com/newsroom/2016/07/06/walmart-pay-now-available-in-all-walmart-stores-nationwide

the future.  The result is an innovation that will make the ease of mobile payments a reality for millions of Americans."[25]  Walmart has continued to provide, to promote, and use Walmart Pay from when it first launched in December 2015 to present.

71.     Before Walmart's release of Walmart Pay in December 2015, Walmart had engaged in a trial of the CurrentC mobile-payment system produced by MCX. Walmart never deployed CurrentC beyond a Columbus, Ohio test.

72.     CurrentC's development ran into significant problems, including technical problems.

73.     Walmart ultimately did not use CurrentC.  Nor did Walmart deploy Apple Pay.[26] Instead, Walmart adopted the technology of Walmart Pay—MEC's technology.

## VI.  CLAIMS

74.     Walmart has been on notice of the Asserted Patents since, at least, the filings of this Complaint and on information and belief, as detailed above, has been on notice of the Asserted Patents prior to the filing of this Complaint.

75.     Walmart has been on notice of its infringement since at least the filing of this Complaint and on information and belief, as detailed above, has been on notice of its infringement prior to the filing of this Complaint.

### A.     Infringement of the '236 Patent

76.     The allegations of each foregoing paragraph are incorporated by reference as if fully set forth herein and form the basis for the following cause of action against Defendant.

77.     Walmart Pay is covered by at least claim 1 of the '236 Patent.

---

[25] https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay
[26] *See, e.g.*, https://www.washingtonpost.com/news/business/wp/2014/09/11/clash-of-the-titans-wal-mart-rejects-apple-pay-to-pursue-its-own-mobile-payment-system/.

78.     Walmart has directly infringed and continues to infringe at least claim 1 of the '236 Patent in violation of 35 U.S.C. § 271(a) by, directly or through intermediaries and without MEC's authority, making, using, selling, and/or offering to sell Walmart Pay in the United States, or importing Walmart Pay into the United States.

79.     Further and in the alternative, Walmart has been actively inducing infringement of at least claim 1 of the '236 Patent in violation of 35 U.S.C. § 271(b).  Users of Walmart Pay directly infringed at least claim 1 of the '236 Patent when they used Walmart Pay in the ordinary, customary, and intended way.  Defendant's inducements included, without limitation and with specific intent to encourage the infringement, knowingly inducing consumers to use Walmart Pay within the United States in the ordinary, customary, and intended way by, directly or through intermediaries, supplying Walmart Pay to consumers within the United States and instructing and encouraging such consumers (for example, via distributing Walmart Pay to mobile phones through app stores and instructing users to use Walmart Pay) how to use Walmart Pay in the ordinary, customary, and intended way, which Defendant knows or should know infringes at least claim 1 of the '236 Patent.  Defendant's inducements may further include, without limitation and with specific intent to encourage the infringement, knowingly inducing customers to use Walmart Pay within the United States, or knowingly inducing customers to use Walmart Pay within the United States, by, directly or through intermediaries, instructing and encouraging such customers to make, use, sell, or offer to sell Walmart Pay in the United States, which Defendant knows or should know infringes at least claim 1 of the '236 Patent.

80.     Further and in the alternative, Defendant has been actively contributing to infringement of at least claim 1 of the '236 Patent in violation of 35 U.S.C. § 271(c).  Defendant has installed the Walmart Pay system and application to process payments wherein a mobile device

scans a QR code presented at the point-of-sale terminal, which is especially made or especially adapted to practice the invention claimed in at least claim 1 of the '236 Patent.  Each Walmart Pay component constitutes a material part of the claimed invention recited in at least claim 1 of the '236 Patent and not a staple article or commodity of commerce because it is specifically configured according to at least claim 1 of the '236 Patent.  Defendant's contributions include, without limitation, making, offering to sell, and/or selling within the United States, and/or importing into the United States, Walmart Pay, which include one or more components, knowing each component to be especially made or especially adapted for use in an infringement of at least claim 1 of the '236 Patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

81.     Further and in the alternative, Walmart has infringed and continues to infringe at least claim 1 of the '236 Patent in violation of 35 U.S.C. § 271(f) via providing Walmart Pay to locations outside of the United States, such as Canada.

82.     Walmart knew or should have known of the '236 Patent but was willfully blind to the existence of the '236 Patent.  Walmart has had actual knowledge of the '236 Patent since at least as early as the filing and service of this Complaint.  By the time of the trial of this case, Walmart will have known and intended that its continued actions since receiving such notice would infringe and actively induce and contribute to the infringement of one or more claims of the '236 Patent.  Walmart's infringement of the '236 Patent has been willful and deliberate.

83.     Walmart and/or users (*e.g.*, Walmart's customers) use Walmart Pay to conduct a transaction between a merchant (Walmart) and/or terminal (Walmart's point-of-sale terminal) and a customer (an individual Walmart customer), where the customer uses a mobile device (*e.g.*, a mobile phone such as a smartphone).

84.     Walmart Pay is available for Android and iOS-based mobile devices.

85.     Walmart Pay allows a customer to "[p]ay with any iOS or Android smartphone[.]"[27]

86.     Walmart Pay "works with any iOS or Android device."[28]

87.     Walmart receives a merchant identifier from the mobile device operated by the customer (*e.g.*, a Walmart Pay user), the merchant identifier indicating a request to initiate a transaction with a merchant terminal identified by the merchant identifier, wherein the merchant identifier does not indicate a transaction amount for the transaction.

88.     On information and belief, for example, Walmart receives a merchant identifier from the mobile device operated by the customer, for example, data reflected in a QR code.

89.     Walmart Pay's scan of the QR code "sends a signal to Walmart's server that it is okay to use Walmart Pay for that particular purchase" and the "signal itself," containing data reflected in the QR code, "does not transmit any financial information":

> We keep our technology simple, & we use tested hardware that's already in place. Walmart Pay doesn't use near-field communication (NFC). Instead, our customers use their smartphones to scan a secure QR code displayed on the same PIN pads at checkout that are being used now. A customer's scan sends a signal to Walmart's server that it is okay to use Walmart Pay for that particular purchase. The signal itself does not transmit any financial information.[29]

90.     For example, Walmart discloses the following usage of Walmart Pay through displaying and scanning a QR code:[30]

---

[27] https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay.
[28] https://corporate.walmart.com/newsroom/2015/12/10/walmart-introduces-walmart-pay.
[29] https://www.walmart.com/cp/walmart-pay/3205993.
[30] https://corporate.walmart.com/_download?id=00000155-c082-de62-a7fd-e6eefa980000.



91.    Walmart shows an example use of this same QR code, in which the transaction amount in the example is $36.26.[31]

92.    Decoded,    this    QR    code    provides    the    following    data: WMT0004108006539214606506612F2AC609CC4D10144.

93.    That data does not include a transaction amount.

94.    That data does not include any payment information (*e.g.*, credit card information).

95.    Walmart receives transaction information from the merchant terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction.

96.    For example, Walmart receives transaction information for a point-of-sale terminal, including the transaction amount (*e.g.*, the total amount due for the transaction).

97.    Walmart Pay's scan of the QR code "sends a signal to Walmart's server that it is okay to use Walmart Pay for that particular purchase":

---

[31] https://corporate.walmart.com/newsroom/videos/b-roll-using-walmart-pay (at 32s).

> We keep our technology simple, & we use tested hardware that's already in place. Walmart Pay doesn't use near-field communication (NFC). Instead, our customers use their smartphones to scan a secure QR code displayed on the same PIN pads at checkout that are being used now. A customer's scan sends a signal to Walmart's server that it is okay to use Walmart Pay for that particular purchase. The signal itself does not transmit any financial information.[32]

98.    The signal received by Walmart's server includes, on information and belief, the identity of the Walmart store and/or point-of-sale terminal.

99.    The Walmart server, on information and belief, receives the amount of the transaction from the point-of-sale terminal and/or the mobile device.

100.    Walmart identifies a purchase account associated with the customer and a deposit account associated with the merchant.

101.    For example, Walmart identifies a purchase account associated with an individual customer (*e.g.*, a credit card, debit card, or other stored-value card saved using Walmart Pay):[33]



---

[32] https://www.walmart.com/cp/walmart-pay/3205993.
[33] https://corporate.walmart.com/newsroom/videos/how-to-register-to-use-walmart-pay.

102.    Walmart identifies a deposit account associated with the merchant in order to complete the transaction, displaying, for example, that "Payment approved" on the point-of-sale terminal.[34]

103.    Walmart initiates the transaction between the merchant and the customer for the transaction amount received from the merchant terminal and the identified purchase account associated with the customer and the identified deposit account associated with the merchant.

104.    Walmart initiates the transaction between the merchant (*e.g.*, Walmart or the individual Walmart point-of-sale terminal) and the customer, for the transaction amount received from the merchant terminal (*e.g.*, the purchase amount) and the identified purchase account (*e.g.*, the credit card or other stored-value card) associated with the customer and the identified deposit account associated with the merchant.

105.    Walmart and/or users of Walmart's infringing instrumentalities (*e.g.*, Walmart's customers) use the Walmart Pay application to conduct a transaction between a terminal (Walmart's point-of-sale terminal) and a customer (an individual Walmart customer), where the customer uses a mobile device (*e.g.*, a mobile phone).

**B.    Infringement of the '058 Patent**

106.    The allegations of each foregoing paragraph are incorporated by reference as if fully set forth herein and form the basis for the following cause of action against Defendant.

107.    Walmart Pay is covered by at least claim 1 of the '058 Patent.

108.    Walmart has directly infringed and continues to infringe at least claim 1 of the '058 Patent in violation of 35 U.S.C. § 271(a) by, directly or through intermediaries and without MEC's

---

[34] https://corporate.walmart.com/newsroom/videos/how-to-register-to-use-walmart-pay.

authority, making, using, selling, or offering to sell Walmart Pay in the United States, or importing Walmart Pay into the United States.

109.    Further and in the alternative, Walmart has been actively inducing infringement of at least claim 1 of the '058 Patent in violation of 35 U.S.C. § 271(b).  Users of Walmart Pay directly infringed at least claim 1 of the '058 Patent when they used Walmart Pay in the ordinary, customary, and intended way.  Defendant's inducements included, without limitation and with specific intent to encourage the infringement, knowingly inducing consumers to use Walmart Pay within the United States in the ordinary, customary, and intended way by, directly or through intermediaries, supplying Walmart Pay to consumers within the United States and instructing and encouraging such consumers (for example, via distributing Walmart Pay to mobile phones through app stores and instructing users to use Walmart Pay) how to use Walmart Pay in the ordinary, customary, and intended way, which Defendant knows or should know infringes at least claim 1 of the '058 Patent.  Defendant's inducements may further include, without limitation and with specific intent to encourage the infringement, knowingly inducing customers to use Walmart Pay within the United States, or knowingly inducing customers to use Walmart Pay within the United States, by, directly or through intermediaries, instructing and encouraging such customers to make, use, sell, or offer to sell Walmart Pay in the United States, which Defendant knows or should know infringes at least claim 1 of the '058 Patent.

110.    Further and in the alternative, Walmart has been actively contributing to infringement of at least claim 1 of the '058 Patent in violation of 35 U.S.C. § 271(c).  Defendant has installed the Walmart Pay system and application to process payments wherein a mobile device scans a QR code presented at the point-of-sale terminal, which is especially made or especially adapted to practice the invention claimed in at least claim 1 of the '058 Patent.  Each Walmart Pay

component constitutes a material part of the claimed invention recited in at least claim 1 of the '058 Patent and not a staple article or commodity of commerce because it is specifically configured according to at least claim 1 of the '058 Patent.  Defendant's contributions include, without limitation, making, offering to sell, and/or selling within the United States, and/or importing into the United States, Walmart Pay, which includes one or more components, knowing each component to be especially made or especially adapted for use in an infringement of at least claim 1 of the '058 Patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

111.    Further and in the alternative, Walmart has infringed and continues to infringe at least claim 1 of the '058 Patent in violation of 35 U.S.C. § 271(f) via providing Walmart Pay to locations outside of the United States, such as Canada.

112.    Walmart knew or should have known of the '058 Patent but was willfully blind to the existence of the '058 Patent.  Walmart has had actual knowledge of the '058 Patent since at least as early as the filing and service of this Complaint.  By the time of the trial of this case, Defendant will have known and intended that its continued actions since receiving such notice would infringe and actively induce and contribute to the infringement of one or more claims of the '058 Patent.  Defendant's infringement of the '058 Patent has been willful and deliberate.

113.    Walmart and/or users (*e.g.*, Walmart's customers) use Walmart Pay to conduct a transaction between a merchant (*e.g.*, Walmart) and/or terminal (*e.g.*, Walmart's point-of-sale terminal) and a customer (*e.g.*, an individual Walmart customer), where the customer uses a mobile device (*e.g.*, a mobile phone such as a smartphone).

114.    Walmart receives, at its payment processing server, a terminal identifier from the mobile device operated by the customer (*e.g.*, a Walmart Pay user), the terminal identifier

indicating a request to initiate a transaction with a terminal identified by the terminal identifier, wherein the terminal identifier does not indicate a transaction amount for the transaction.

115.    For example, Walmart receives a terminal identifier from the mobile device operated by the customer, for example, data reflected in a QR code.

116.    The terminal identifier (*e.g.*, data evidenced in a QR code) indicates a request to initiate a transaction with a terminal (*e.g.*, the point-of-sale terminal) identified by the terminal identifier.

117.    Walmart's payment processing server sends, in response to receiving the terminal identifier, a transaction information request to the terminal associated with the terminal identifier.

118.    For example, Walmart sends, in response to receiving the identifier (*e.g.*, "customer scan" containing a "secure QR code") from the mobile device operated by the customer, a transaction information request (from "Walmart's server") to the particular point-of-sale terminal associated with the "customer scan" and QR code, as further detailed above in connection with Walmart's scanning and processing QR code data.

119.    Walmart receives, at its payment processing server, transaction information from its terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction.

120.    For example, Walmart receives transaction information for a point-of-sale terminal, including the transaction amount (*e.g.*, the total amount due for the transaction).

121.    The signal received by Walmart's server includes, on information and belief, the identity of the Walmart store and/or point-of-sale terminal.

122.    The Walmart server, on information and belief, receives the amount of the transaction from the point-of-sale terminal and/or the mobile device.

123.    Walmart identifies, at its payment processing server, a customer account associated with the customer and a terminal account associated with the terminal.

124.    For example, Walmart identifies a purchase account associated with an individual customer (*e.g.*, a credit card, debit card, or other stored-value card saved using the customer's Walmart Pay application).[35]

125.    Walmart identifies a deposit account associated with the merchant in order to complete the transaction, displaying, for example, that "Payment approved" on the point-of-sale terminal.[36]

126.    Walmart initiates the transaction between the merchant and the customer for the transaction amount received from the merchant terminal and the identified purchase account associated with the customer and the identified deposit account associated with the merchant.

127.    Walmart initiates the transaction between the merchant (*e.g.*, Walmart or the individual Walmart point-of-sale terminal) and the customer, for the transaction amount received from the merchant terminal (*e.g.*, the total purchase amount) and the identified purchase account (*e.g.*, the credit card or other stored-value card) associated with the customer and the identified deposit account associated with the merchant, as shown below.

128.    Walmart, at its payment processing server, initiates the transaction between the terminal and the customer for the transaction amount received from the terminal.

129.    Walmart initiates the transaction between the terminal (*e.g.*, the individual Walmart point-of-sale terminal) and the customer, for the transaction amount received from the terminal

---

[35] https://corporate.walmart.com/newsroom/videos/how-to-register-to-use-walmart-pay.
[36] https://corporate.walmart.com/newsroom/videos/how-to-register-to-use-walmart-pay.

(*e.g.*, the total purchase amount) and the identified customer account (*e.g.*, the customer's credit card or other stored-value card).

## VII.   JURY DEMAND

130.   Pursuant to Federal Rule of Civil Procedure 38(b), MEC requests a jury trial of all issues triable of right by a jury.

## VIII.   PRAYER FOR RELIEF

MEC respectfully requests the Court enter an order providing the following relief:

1. A judgment in favor of MEC that Defendant has infringed each Asserted Patent, whether literally or under the doctrine of equivalents;

2. A judgment that such infringement of each Asserted Patent has been willful and deliberate as described herein;

3. A judgment and order permanently enjoining Defendant, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with it, from further acts of infringement of the Asserted Patents pursuant to 35 U.S.C. § 283;

4. A judgment and order requiring Defendant to pay MEC its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant's infringement of each Asserted Patent as provided under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict or post-judgment infringement with an accounting as needed;

5.   A judgment and order requiring Defendant to pay MEC enhanced damages for willful infringement as provided under 35 U.S.C. § 284;

6.   A judgment and order finding this case exceptional and requiring Defendant to pay MEC its reasonable attorneys' fees and costs incurred in this litigation pursuant to 35 U.S.C. § 285, together with pre-judgment and post-judgment interest thereon; and

7.   Awarding MEC all such other and further relief, in law or equity, as the Court deems just and proper under the circumstances.

Dated: April 07, 2021

Respectfully submitted,

/s/     William E. Davis, III
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com

Christian J. Hurt
Texas State Bar No. 24059987
churt@davisfirm.com

Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com

**THE DAVIS FIRM, P.C.**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

ATTORNEYS FOR PLAINTIFF MOBILE
EQUITY CORP.