**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| Mobile Equity Corp., | |
| *Plaintiff*, | Civil Action No.: 2:21-CV-00126-JRG-RSP |
| v. | JURY TRIAL DEMANDED |
| Walmart Inc., | |
| *Defendant*. | |

**MOBILE EQUITY CORP.'S**
**MOTION FOR SUMMARY JUDGMENT ON**
**PATENT-ELIGIBLE SUBJECT-MATTER UNDER SECTION 101**

## I.       INTRODUCTION

MEC respectfully requests that the Court grant summary judgment under *Alice* Step-One against Walmart.  The record in this case, which is largely undisputed, shows that the claims of the MEC Patents address a problem relating to the security of payment computer network systems (indeed, it is undisputed that a claimed benefit of the MEC Patents is security).  The record likewise shows that the claims of the MEC Patents improve security capabilities in a specific, concrete way that is not only different than existing systems—but is the opposite of those systems (and an unconventional approach).  Under governing *Alice* Step-One authority, Walmart is unable to prove its eligibility defense as a matter of law.

## II.       STATEMENT OF THE ISSUE

The MEC Patents are directed to a specific, concrete mobile-payment solution that improve upon the security capabilities for payment computer network systems that does not preempt the uses of numerous mobile-payment systems.  Has Walmart failed to prove its eligibility defense under *Alice* Step-One as a matter of law?

## III.       STATEMENT OF UNDISPUTED MATERIAL FACTS

1.       A claimed benefit of the MEC Patents is security.  Jakobsson Rebuttal Report (attached as Exhibit 1), at ¶ 103; Rhyne Rebuttal Report (attached as Exhibit 2), at ¶ 269;

2.       In 2010, Walmart stated the following (Jakobsson Rebuttal Report, at ¶ 373 (quoting File History for U.S. Patent App. No. 13/046,525 (attached as Exhibit 3).

- "[C]ompleting a transaction using a wireless device is clearly not an idea 'of itself,' or mathematical relationships/formulas. Moreover, while entering transactions with credit/debit cards, checks, or paper money may be a fundamental economic practice, the concept of completing a transaction using a wireless device is not. In this regard, completing transactions using a wireless device is a relatively new practice, that has only been introduced to us after the widespread use of mobile devices. The use of mobile device to complete transaction introduces new problems to transaction processing that did not exist before mobile payment processing and that require technical solutions. . . . ."

1

- "[T]he concept of completing a transaction using a mobile device is not a mere organization of human activities. Various wireless communications and data interactions are required to complete a transaction using a mobile device[.] The communications and interactions necessarily require the use of some sort of computing device (for example, a mobile device and a telecommunications service provider server), and such communications and interactions cannot be performed by a human. Thus, performing a transaction payment using a mobile device is not a mere method of organizing human activity."

3.     The claims of the MEC Patents do not cover certain Near-Field Communications ("NFC") mobile-payment solutions, such as those implemented by Apple Pay and Google Wallet / Android Pay.  Rhyne Rebuttal Report, at ¶ 279; Jakobsson Rebuttal Report, at ¶ 350.

4.     The claims of the MEC Patents do not cover certain Scan-From-Glass mobile-payment solutions, such as those implemented by Starbucks, Alipay, and WeChat Pay.  Rhyne Rebuttal Report, at ¶ 281; Jakobsson Rebuttal Report, at ¶ 353.

5.     The Patent Office expressly considered Section 101 during prosecution of the '058 Patent, including under the *Alice v. CLS Bank* decision.

## IV.   APPLICABLE LAW

This Court is familiar with the two-step framework under the Supreme Court's *Alice* decision.  *See, e.g.*, *Cxt Sys. v. Academy*, No. 2:18-CV-00171-RWS-RSP, 2020 U.S. Dist. LEXIS 255698, at *16-18 (E.D. Tex. Feb. 3, 2020) (collecting cases).  At *Alice* Step-One, the Court considers what the claims are directed to, *i.e.*, whether the claims at issue are directed to a patent-ineligible concept (such as an abstract idea).  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).  If the claims are directed to a patent-ineligible concept, the *Alice* Step-Two considers if the claim elements, individually and as an ordered combination, transform the nature of the claim into a patent-eligible application.  *Id.* at 217–18.

This Motion focuses on the threshold legal question under *Alice* Step-One.  Courts approach the Step-One inquiry by asking "what the patent asserts to be the 'focus of the claimed

advance over the prior art.'"  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (internal quotation omitted).  The analysis "must focus on the language of the Asserted Claims themselves . . . considered in light of the specification."  *Id.* at 1292–93 (internal quotations and citations omitted).  And the Federal Circuit has "reiterated the Supreme Court's caution against 'overgeneralizing claims' in the § 101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'"  *Id.* at 1293 (citation omitted).

In software cases, the Step-One inquiry "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool."  *TecSec*, 978 F.3d at 1293 (quotation omitted and collecting authority).  Two inquiries that courts look to include: (1) "whether the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers"; and (2) "whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function."  *Id.* (quotations omitted).

## V.    ARGUMENT

The record shows that the claims of the MEC Patents are eligible under *Alice* Step-One under both inquiries recited in the *TecSec* line of authority.  Walmart has failed to adequately show otherwise.  For that reason, MEC respectfully requests that the Court enter summary judgment against Walmart on its Section 101 defense.

### A.    The MEC Patents Are Focused on a Problem Specifically Arising in the Realm of Computer Networks, Namely Security in Payment Computer Network Systems

The MEC Patents originate from a technical field, financial technology (generally known as "FinTech") relating to mobile payments.  *See, generally*, Jakobsson Rebuttal Report, at ¶¶ 338–

375, 377–380.  One of the primary problems, in general, in the payment computer network systems area is security.  *See id*.  The traditional payment computer systems (such as point-of-sale-based systems) have security vulnerabilities because they exposed the customer's payment information at the terminal (*e.g.*, swiping a credit card exposes the credit card number).  *See, e.g.*, '236 Patent, at 1:48–56.  By 2009 (the priority date of the MEC Patents), most of the innovation had been directed at securing the traditional payment architecture flow to reduce the risk that the data is compromised (*e.g.*, near-field communications (or "NFC"), Euro-MasterCard-Visa  (or "EMV"), and other solutions that may use encryption, security tokens, and other mechanisms).  *See, e.g.*, Jakobsson Rebuttal Report, at ¶¶ 338–355; *see also* '236 Patent, at 1:66–2:6 (describing NFC and EMV); *id.* at ¶¶ 377–380 (describing security vulnerabilities and how other solutions address those vulnerabilities).

Security has remained an issue with mobile payment technologies, a number of which at least in conception by 2009 and thereafter (*e.g.*, Apple Pay, Obopay, and the Starbucks Mobile App, among others).  *See, e.g.*, Jakobsson Rebuttal Report, at ¶¶ 342–372.  Those solutions, similar to other payment innovations, tended to focus on at securing the traditional payment architecture flow using encryption-related technologies.  *See, e.g.*, *id.* (discussing for example, the security mechanisms for NFC-based mobile-payment solutions and magnetic stripe technology (or "MST")).  Walmart itself also asserted to the Patent Office that the mobile-payment field was one with technical roots and solutions to complete a transaction with a mobile device were not directed to an abstract idea, a fundamental economic practice, a mental process, or organization of human activity.  *See, e.g.*, SUMF No. 2; Jakobsson Rebuttal Report, at ¶ 373 (quoting File History for U.S. Patent App. No. 13/046,525 (attached as Exh. 3); *see also* Jakobsson Rebuttal Report, at ¶ 374 (reproducing portions arguments to Patent Office that mobile-payment functionality "does not

even exist outside the realm of computer networks").  Walmart itself has similarly characterized

. *See, e.g.*, *id.* at ¶¶ 355–372 (collecting Walmart documentation).

This evidence establishes that the claims of the MEC Patents arise from a technical field and are directed to a technical problem.

**B.     The Claims of the MEC Patents Improve Payment Computer Network Security Capabilities in a Specific, Concrete Way**

This evidence also establishes that the claims of the MEC Patents provide a specific, concrete improvement in the security capabilities of payment computer networks, specifically for mobile payments. *See, e.g.*, Jakobsson Rebuttal Report, at ¶¶ 376–394.  The claims are drawn to a specific new "reverse" software architecture that is a specific improvement to how merchant-payment networks operate, specifically their security. *See, e.g.*, *id.* at ¶¶ 383–394. The technology covered by the claims provides two main technological advances: (1) an advance in security (it is undisputed that one of the claimed benefits of the MEC Patents is security, SUMF No. 1), *see, e.g.*, Jakobsson Rebuttal Report, at ¶ 102; and (2) the achieving this advance in security by utilizing the existing "rails" on which the payment computer system infrastructure is built while rearchitecting the system via software, *see, e.g.*, *id.* at ¶ 103.

A review of each claim limitation shows how the claims of the MEC Patents make these technological improvements over other types of systems and architectures. *See, e.g.*, Jakobsson Rebuttal Report, at ¶¶ 385–394 (describing each limitation of the independent claims and how each is "directed to an advance in the security of the overall payments computer system" and/or shows that the claims are "able to utilize the existing 'rails' on which the payment computer system is built to rearchitect the system in a software sense while relying on the underlying payment

infrastructure"). For example, the first three steps of the independent claims[1] define a software system that is more secure than the traditional system without the need utilize encryption or other security measures to protect sensitive data (*e.g.*, NFC-based solutions such as Apple Pay) or using customer data in another format (*e.g.*, Scan-From-Glass solutions such as the Starbucks Mobile App). *See, e.g.*, *id.* The last two limitations[2] are drawn to increasing security by keeping sensitive financial data at a secure server as well as allowing the use of existing rails to initiate transactions. *See, e.g.*, *id.* The claims thus solve the security drawbacks of existing systems in which the customer's sensitive financial data is exposed at the terminal through the specific reverse architecture reflected in the claims. *See, e.g.*, *id.*

---

[1] These are the following limitations in claim 1 of the '236 Patent: "receiving a merchant identifier from the mobile device operated by the customer, the merchant identifier indicating a request to initiate a transaction with a merchant terminal identified by the merchant identifier, wherein the merchant identifier does not indicate a transaction amount for the transaction; sending, in response to receiving the merchant identifier, a transaction information request to the merchant terminal associated with the merchant identifier; receiving transaction information from the merchant terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction." These are also the following limitations in the '058 Patent: "receiving, at the payment processing server, a terminal identifier from the mobile device operated by the customer, the terminal identifier indicating a request to initiate a transaction with a terminal identified by the terminal identifier, wherein the terminal identifier does not indicate a transaction amount for the transaction; sending, at the payment processing server, in response to receiving the terminal identifier, a transaction information request to the terminal associated with the terminal identifier; receiving, at the payment processing server, transaction information from the terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction."

[2] These are the following limitations in claim 1 of the '236 Patent: "identifying a purchase account associated with the customer and a deposit account associated with the merchant; and initiating the transaction between the merchant and the customer for the transaction amount received from the merchant terminal and the identified purchase account associated with the customer and the identified deposit account associated with the merchant." These are also the following limitations in the '058 Patent: "identifying, at the payment processing server, a customer account associated with the customer and a terminal account associated with the terminal; and initiating, at the payment processing server, the transaction between the customer account and the terminal account for the transaction amount received from the terminal."

The claims of the MEC Patents also cover a specific, concrete solution and not simply the desirable result or function.  The claims do not broadly claim reversing the transaction data flow.  Nor do they claim reversing the transaction flow to increase security.  It is undisputed that the claims of the MEC Patents do not cover many types of mobile-payment solutions.  SMUF No. 3–4 (referring to NFC-based solutions such as Apple Pay and Google Wallet and Scan-From-Glass-based solutions such as Starbucks, Alipay, and WeChat Pay); *see also* Jakobsson Rebuttal Report, at ¶¶ 346–371 (discussing various solutions that would not utilize technology of claims of the MEC Patents).  And the specific, concrete nature of the claims is reflected in the fact that the MEC Patent claims do not cover a host of mobile-payment technologies.  *See, e.g.*, Jakobsson Rebuttal Report, at ¶¶ 342–371, 393, 436 (detailing the NFC-based solutions, Scan-From-Glass solutions, MST solutions that do not utilize the MEC Patent claims, among others).

### C.    The Claims of the MEC Patents Are Not Directed to an Abstract Idea

In view of the above evidentiary record, the claims are not directed to an abstract idea under *Alice* Step-One as a matter of law.  Walmart's technical expert (Dr. Rhyne), however, contends that the claims of the MEC Patents are directed to an abstract idea, using various formulations: that the "the asserted claims merely require the collection and/or transfer of data," Rhyne Report at ¶¶ 448–449 (attached as Exhibit 4); that "[t]he asserted claims merely require the collection of information, such as a merchant (or terminal) identifier, a transaction amount, accounts associated with a customer and merchant, in order to initiate the conventional and fundamental task of conducting a transaction between the customer and the merchant for the transaction amount," *see, e.g.*, *id.*; and that the MEC Patents "addresses a business problem," specifically "card not present" transactions, *see e.g.*, *id.* at ¶¶ 451–454.  MEC expects Walmart to repeat those arguments.  They are wrong.

These assertions do not show that the claims are directed to an abstract idea.  They

improperly abstract away key limitations from claim language, ignore the technical backdrop in which the MEC Patents were conceived (including Walmart's own statements about the technical nature of the field), and ignore how the solution in the MEC Patents improve upon security—an undisputed benefit of claims of the MEC Patents.  SUMF No. 1; *see also* Jakobsson Rebuttal Report, at ¶¶ 395–398.  And these assertions are largely a retread of the arguments that the Patent Office considered during prosecution and ultimately rejected when it allowed the '058 Patent. SUMF No. 5; *see also* Jakobsson Rebuttal Report, at ¶¶ 413–414 (discussing arguments).

This was incorrect under established law.  The *Alice* Step-One analysis "depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance." *TecSec*, 978 F.3d 1278, 1294 (Fed. Cir. 2020).  That accuracy is "crucial to the sound conduct of the inquiries into the problem being addressed and whether the line of specificity of solution has been crossed." *Id.*  For that reason, it is improper to generalize the claims at "a high level of abstraction" that is "untethered from the language." *Id.* at 1293.

It was thus improper for Walmart's technical expert to read these limitations out of the claims.  And the Court can conclude that Walmart has failed to show that the claims of the MEC Patents are directed to an abstract idea on that basis.  *See, e.g.*, *Alexsam, Inc. v. Cigna Corp.*, No. 2:20-cv-00081-JRG-RSP, 2020 U.S. Dist. LEXIS 231313, at *11 (E.D. Tex. Oct. 25, 2020) (Payne, M.J.) (denying motion where defendant "overgeneralizes the claims and describes them at too high of a level of abstraction" and "improperly reads out important elements of the claims"); *Intellectual Ventures I LLC v. J. Crew Grp., Inc.*, No. 6:16-CV-196-JRG, 2016 U.S. Dist. LEXIS 125587, at *16-17 (E.D. Tex. Aug. 24, 2016) (Gilstrap, C.J.) (rejecting defendant's "overly generalized view of the claim language that vitiates meaningful limitations"); *Luminati Networks*, 2021 U.S. Dist. LEXIS 24742, at *14  (denying motion where defendant improperly "boil[ed] the

asserted claims down to nothing more than the actions of 'requesting,' 'sending,' and 'identifying'").

The claims of the MEC Patents—which undisputedly have a benefit of increasing security—reflect a specific, concrete improvement in the security of payment computer network systems.  This type of improvement survives an *Alice* Step-One challenge as a matter of law.  *See, e.g.*, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) (upholding eligibility of claims that "recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices"); *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (upholding eligibility of claims directed to "a new and useful technique for using sensors to more efficiently track an object on a moving platform"); *Alexsam*, 2020 U.S. Dist. LEXIS 231313, at *12 (denying pleadings challenge to claims the plaintiff argued "are directed to specific functions to form a 'system' to process two different types of information, specifically financial transaction data and healthcare-related information"); *Uniloc United States, Inc. v. Samsung Elecs. Am., Inc.*, No. 2:17-CV-00651-JRG, 2018 U.S. Dist. LEXIS 176336, at *12 (E.D. Tex. Sep. 18, 2018) (Gilstrap, C.J.) (denying pleadings challenge to claim "directed towards the unconventional use of accelerometers in a step counter in order to measure the incline travelled by the user").

## VI.    CONCLUSION

For the foregoing reasons, MEC requests that the Court grant this Motion.

Dated: March 1, 2022

/s/  Christian J. Hurt

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
Christian J. Hurt
Texas State Bar No. 24059987

churt@davisfirm.com
Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com
Ty Wilson
Texas State Bar No. 24106583
twilson@davisfirm.com
**THE DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

*Counsel for Plaintiff Mobile Equity Corp.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document and all attachments thereto are being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served this March 1, 2022 on all counsel of record, each of whom is deemed to have consented to electronic service.  L.R. CV-5(a)(3)(A).

/s/ Christian Hurt_____
Christian Hurt